421 A.2d 406

**Teresea Alper RUPEL**

v.

**Ronald BLUESTEIN, Esquire, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 12, 1979.

Filed July 25, 1980.

66

68

Elwood S. Levy, Philadelphia, for appellant.

Albert Momjian, Philadelphia, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

This appeal arises from an order granting appellee's petition for a preliminary injunction.

On September 25, 1978, appellee filed a complaint in equity alleging that by order of an Indiana court she had been given custody of her two children; that her ex–husband had abducted her children from her custody; and that appellant knew her ex–husband's whereabouts and was aiding him in fleeing from legal authority. The complaint requested, among other things, that appellant be compelled to disclose to appellee her ex–husband's location. Also on September. 25, appellee filed an *ex parte* petition for a preliminary injunction, which the lower court granted the same day. The lower court's order stated:

> Defendant, Ronald Bluestein, Esquire, is hereby restrained and enjoined from informing ... [appellee's husband], his agents, servants or employees, in any manner whatsoever, whether directly or indirectly, whether by himself or through his agents, servants or employees, as to the institution of these proceedings or the pendency thereof.

On September 28, the lower court ordered that the preliminary injunction continue in effect until a hearing could be held on October 6, and also ordered, for the first time, that appellee file bond in the amount of $100, which appellee did the same day. On October 6, a hearing limited to legal argument was held. The hearing was ultimately continued until October 10, the lower court ordering the preliminary injunction to continue in effect meanwhile. However, no hearing was held on the 10th, and on October 11, the court, with the consent of the parties, rescheduled the hearing for October 31; the court also ordered the preliminary injunction to continue in effect.[1] On October 12, appellant filed preliminary objections to the complaint, and on October 23, this appeal was filed.[2]

## I

### *Does the lower court have jurisdiction to entertain this action?*

Appellant argues that the lower court lacks jurisdiction to entertain appellee's action because the sole objective of the action is to obtain discovery from appellant, and no other action is at present pending in the Pennsylvania courts to which the discovery could be relevant. *See Cole v. Wells*, 406 Pa. 81, 177 A.2d 77 (1962); *see also T. C. R. Realty Co. v. Cox*, 472 Pa. 331, 372 A.2d 721 (1977); *Einhorn v. Phila. Electric Co.*, 410 Pa. 630, 190 A.2d 569 (1963).

There can be no doubt that appellee had the right to invoke the Uniform Child Custody Jurisdiction Act, 11 P.S. §§ 2301 *et seq.* (1979–80 Supp.), to enforce the order of the

1. The record supports appellant's assertion that at the October 6 hearing he agreed only to the continuance of the hearing; he did not agree to the court's "reissuance" of the preliminary injunction.

2. We exercise jurisdiction over this appeal pursuant to 42 Pa.C.S.A. § 742 (1979 Pamphlet) and Pa.R.A.P. Nos. 311, 701. It may be noted that appellee does not argue that this appeal is premature and therefore should be quashed, *see Roth v. Columbia Distributing Co.*, 371 Pa. 297, 89 A.2d 825 (1952); *United Elec., Radio & Machine Workers of America v. Sherman*, 352 Pa. 133, 41 A.2d 860 (1945), and we do not consider the issue.

Indiana Court giving her custody of her two children. Section 2314 of the Act provides:

> The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this act or which was made under factual circumstances meeting the jurisdictional standards of the act, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this act.

Section 2316(a) provides:

> A certified copy of a custody decree of another state whose decrees are recognized under section 14 may be filed in the office of the prothonotary of any court of common pleas of this State. The prothonotary shall treat the decree in the same manner as a custody decree of the court of common pleas of this State. A custody decree so filed has the same effect and shall be enforced in like manner as a custody decree rendered by a court of this State.

Section 2321(a) provides:

> Upon request of the court of another state the courts of this State which are competent to hear custody matters may order a person in this State to appear at a hearing to adduce evidence or to produce or give evidence under other procedures available in this State or may order social studies to be made for use in a custody proceeding in another state. A certified copy of the transcript of the record of the hearing or the evidence otherwise adduced, any psychological studies and any social studies prepared shall be forwarded to the requesting court.

█ Appellee's counsel, for reasons best known to himself, apparently has not invoked these provisions. There is no evidence of record that a certified copy of the Indiana custody decree has been filed with the prothonotary of the lower court pursuant to section 2316(a), nor is there evidence that the Indiana court has requested the Pennsylvania courts to conduct discovery in connection with custody pro-

ceedings before it. Instead, counsel has filed the present complaint in equity. It is therefore arguable that the lower court lacked jurisdiction either for the reason appellant assigns, *i. e.*, that appellee's action was an improper bill of discovery, or for the reason that appellee has failed to exhaust her statutory remedies. *See generally* 5 Goodrich–Amram § 1509(b):1. Since the existence of an exclusive statutory remedy is normally a non–waivable objection, *id.*, we should consider both issues.

## A

■ It is difficult to believe that the drafters of the Uniform Child Custody Jurisdiction Act intended the act to be the exclusive remedy for a parent who is trying to regain the custody of children who have been abducted by the other parent. Section 2302(a) of the act provides:

The general purposes of this act are to:

    \*      \*      \*      \*      \*      \*

(5) deter abductions and other unilateral removals of children undertaken to obtain custody awards;

    \*      \*      \*      \*      \*      \*

(7) facilitate the enforcement of custody decrees of other states:

(8) promote and expand the exchange of information and other forms of mutual assistance between the courts of this State and those of other states concerned with the same child . . . .

Subsection (b) of the same provision states:

This act shall be construed to promote the general purposes stated in this section.[3]

---

3. Our attention has been called to sections 2304(a)(1), (2), and (3) of the Uniform Child Custody Jurisdiction Act. These provisions are:

A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
(1) this State:
(i) is the home state of the child at the time of commencement of the proceeding; or

The act does not state that it is to be the exclusive remedy to regain custody of abducted children, nor does there appear to be any public policy that would justify such a limitation. In other cases courts have recognized that in creating a statutory remedy the Legislature does not always intend to displace traditional equitable remedies, but sometimes intends to make the statutory remedy permissive or alternative only. *E. g., DeLuca v. Buckeye Coal Co.,* 463 Pa. 513, 345 A.2d 637 (1975). Here, the Legislature must have intended the remedies provided by the act to be alternative, and thus cumulative, to the traditional equitable remedies, for that would be the best way to achieve its general purposes of "deter[ring] abductions" and "facilitat[ing] the enforcement of custody decrees of other states."

## B

This conclusion reached, the question becomes whether appellee's action is maintainable under the principles governing traditional actions in equity.

> (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State;
> (2) it is in the best interest of the child that a court of this State assume jurisdiction because:
> (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State; and
> (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;
> (3) the child is physically present in this State, and:
> (i) the child has been abandoned; or
> (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent . . . .
> These provisions are inapplicable to the present case. They only confer jurisdiction on the courts of this Commonwealth to make child custody determinations; here, the lower court was not asked to make such a determination. Rather, it was asked to compel appellant to disclose the whereabouts of appellee's ex–husband and children, so that the existing court orders of the Indiana courts could be enforced.

█ It has been held that equitable jurisdiction attaches "when an individual equity–plaintiff has shown that the wrongdoer's acts, in addition to violating the criminal law, are also interfering with that individual plaintiff's property rights .... or with that individual plaintiff's personal or civil rights." *Pa. S.P.C.A. v. Bravo Enterprises*, 428 Pa. 350, 359, 237 A.2d 342, 347 (1968). *See also Commonwealth ex rel. Costa v. Boley*, 441 Pa. 495, 272 A.2d 905 (1971); *Lackey v. Sacoolas*, 411 Pa. 235, 191 A.2d 395 (1963); *Everett v. Harron*, 380 Pa. 123, 110 A.2d 383 (1955); *Rankin v. Chester–Upland School Dist.*, 11 Pa.Cmwlth. 232, 312 A.2d 605 (1973). More generally, it has been stated that "[c]ourts of equity . . . have the power to prevent or restrain the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals." *Bruhin v. Commonwealth*, 14 Pa.Cmwlth. 300, 304, 320 A.2d 907, 910 (1974). *See also* 17 P.S. § 282 (1962), *repealed by* the Judiciary Act Repealer Act, 42 Pa.C.S.A. § 20002(a) [152] (1979 Pamphlet) (present provision at 42 Pa.C.S.A. § 931 (1979 Pamphlet)). Courts in equity are also competent to exercise jurisdiction over cases of fraud, *Safeguard Mutual Ins. Co. v. Huggins*, 241 Pa.Super. 382, 361 A.2d 711 (1976); *Maccabees v. Cappas*, 164 Pa.Super. 317, 64 A.2d 513 (1949), and cases involving tortious conspiracy. *Benjamin v. Foidl*, 379 Pa. 540, 109 A.2d 300 (1954).

█ Appellee's complaint alleges that appellant "has knowingly counseled [appellee's ex–husband] in the commission of a felony, to wit: child stealing, and continues to knowingly aid and abet [appellee's ex–husband] in the commission of a crime and in the violation of court orders of the State of Indiana." These allegations have not been proved, but if proved, the conduct they describe is the sort of wrongful conduct that a court in equity is competent to enjoin. Indeed, the jurisdiction of the lower court would be established even without allegations of abetting the commission of a crime and the violation of court orders. In an analogous area the Supreme Court has held that an action in equity will lie to enjoin wrongful interference by third

parties with existing contractual relationships. *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), *appeal dismissed*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). Given this holding, it is clear that an action in equity will lie to enjoin interference with the more important relationship of a parent's legal custody of her children.

It should also be noted that appellant's assertion that appellee's complaint asks only for discovery of the whereabouts of appellee's ex–husband and children is inaccurate. The complaint asks not only for discovery, but for general equitable relief. General relief certainly could encompass, upon adequate proof, restraints on appellant to prevent his abridgement of appellee's custody rights in any way whatsoever.

## II

### *Did appellee demonstrate her right to a preliminary injunction?*

Appellant argues that the procedure followed by counsel for appellee was defective in two respects: the complaint was improperly verified, *see* Pa.R.Civ.P., R. 1024, and the petition for a preliminary injunction was not verified at all, *see* Pa.R.Civ.P., R. 206. In appellant's view, the result of these defects was to oust the jurisdiction of the lower court.

The defects were not jurisdictional. Verification is required only for the protection of the parties. *Monroe Contract Corp. v. Harrison Square, Inc.*, 266 Pa.Super. 549, 557, 405 A.2d 954, 959 n. 5 (1979). Moreover, the petition for a preliminary injunction did not have to be verified because it did not contain allegations of fact, but merely incorporated the allegations of the complaint and alleged that immediate and irreparable harm would result if appellant communicated with appellee's ex–husband regarding the institution or pendency of the action. *See* Pa.R.C.P. 206; 2 Goodrich–Amram 2d § 1024(a):1 at 213 ("If the pleading adds no new facts, denies no facts already pleaded, but raises only issues of law, there is no purpose in an oath and none is required").

## B

The question remains, however, whether the lower court should have issued a preliminary injunction even though it had the power–jurisdiction–to do so.

Pa.R.C.P. 1024(c) requires a complaint to be verified by one or more of the parties filing the pleading unless all the parties (1) lack sufficient knowledge or information, or (2) are outside the jurisdiction of the court and the verification of none of them can be obtained within the time allowed for filing the pleading. In such cases, the verification may be made by any person having sufficient knowledge or information and belief and shall set forth the source of his information as to matters not stated upon his own knowledge and the reason why the verification is not made by a party.

Here the complaint was not verified by appellee, but by her attorney as follows:

ALBERT MOMJIAN, being duly sworn according to law, deposes and says that he is one of the attorneys representing plaintiff in the instant action, that he is authorized to take this Affidavit on behalf of plaintiff as set forth in a certain Affidavit of Authorization given by plaintiff and dated July 28, 1978 and attached hereto, and that the facts set forth in the within Complaint in Equity are true and correct to the best of his knowledge, information and belief.

As appellant points out, this verification was defective in two respects: It did not state why appellee was unable to verify the complaint herself; and it did not state the source of counsel's information as to matters not stated upon counsel's own knowledge.

■ Improper verification of a complaint may not be brushed aside as a mere "legal technicality," *cf. Madigan Appeal*, 434 Pa. 361, 367, 253 A.2d 271, 274 (1969), and may result in the waiver of rights by the pleader. *Warren v.*

*Williams,* 370 Pa. 380, 88 A.2d 406 (1952).[4]  On the other hand, we must also be cognizant of the admonition in Pa.R.Civ.P., R. 126 that "[t]he rules [of civil procedure] shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable.  The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties."  "Courts should not be astute in enforcing technicalities to defeat apparently meritorious claims . . . .  The procedural rules are not ends in themselves, but means whereby justice, as expressed in legal principles, is administered;  they are not to be exalted to the status of substantive objectives. . . . "  *General Mills, Inc. v. Snavely,* 203 Pa.Super. 162, 167, 199 A.2d 540, 543 (1964) (citations omitted). *See also Provco Leasing Corp. v. Safin,* 265 Pa.Super. 423, 402 A.2d 510 (1979);  *Milford Traumbauersville Area Sewer Authority v. 0.753 Acres of Land,* 25 Pa.Cmwlth. 13, 358 A.2d 450 (1976).

In *Monroe Contract Corp. v. Harrison Square, Inc., supra,* counsel's verification stated that his client "lacked sufficient knowledge to make verification" but did not state that the client also "lacked sufficient information."  We held that although "counsel may verify *only* in those cases in which the conditions delineated in Rule 1024 are present," counsel's error was *de minimis* error, and that the petition in question should not be dismissed.  Similarly, in *Safeguard Invest. Co. v. Davis,* 239 Pa.Super. 300, 361 A.2d 893 (1976), where appellant's attorney improperly verified a petition to open a confessed judgment entered on one of two mortgage bonds, we held that the defect was inconsequential because appellant had properly verified a second petition to open the confessed judgment that had been entered on the other mortgage bond.

**4.**  In *Warren,* the defendant argued that the plaintiff's failure to deny allegations in preliminary objections constituted an admission that the defendant did not reside at the address where service was made. The Court rejected this argument on the ground that the preliminary objections were improperly verified.

In the present case, the defect in the verification of the complaint is more serious than the defect present in *Monroe*. In *Monroe*, we had little trouble finding that counsel had the right to verify the petition to open or strike judgment. Here, however, counsel's right to verify the complaint is very doubtful. Nothing in the record suggests that appellee lacked sufficient knowledge or information to verify the complaint. Indeed, all indications are to the contrary. Moreover, while it appears that appellee resided outside Pennsylvania, she could avoid the duty to make personal verification of the complaint only if she was outside the jurisdiction of the court *and* her verification could not be obtained within the time allowed for filing of the pleading. 2 Goodrich–Amram 2d § 1024(c):1 at 220 n. 39. Again, nothing in the record suggests the satisfaction of these conditions.[5] The defect in the verification of the complaint is also more serious than the defect present in *Safeguard*. In *Safeguard*, the appellant had filed a second, properly verified, petition ("the virtual twin of the first"). Here, no properly verified complaint has ever been filed. In addition, as previously noted, counsel's verification here had a further defect, not present in either *Monroe* or *Safeguard*, in that it did not state which allegations were made on the basis of counsel's own knowledge or the source of counsel's information as to matters not stated on his own knowledge.

Were we presented with the issue of whether the improper verification required dismissal of the complaint, we might well be reluctant to dismiss. Appellee's affidavit authorizing her counsel to act on her behalf is attached to the complaint. The affidavit states that appellee is the mother of two children, that her ex–husband has removed the children from Indiana and secreted himself and the children from her, that the whereabouts of her ex–husband and the

5. Indeed, one can only be puzzled by counsel's failure to secure appellee's verification of the complaint. Counsel was able to secure appellee's verification to the Affidavit of Authorization on July 28, 1978. Counsel's verification to the complaint is dated August 15, 1978. Furthermore, apparently there was no need to file the complaint immediately, for it was not filed until September 25, 1978.

children are unknown to her, and that appellant has information concerning the whereabouts of the ex–husband and the children. Taken together, the affidavit of authorization and the exhibits attached to the complaint indicate the basis upon which appellee's counsel made his verification.[6] The issue before us, however, is not whether the improper verification required dismissal of the complaint, but rather whether a preliminary injunction should have issued, given the defective complaint, and given appellee's failure to present any evidence (other than the complaint) in support of the preliminary injunction.

■ It is well–established that in order to receive the benefit of a preliminary injunction appellee was required to demonstrate 1) that her right to relief was clear; 2) that her need for relief was immediate; 3) that her potential injury was irreparable; and 4) that she had no adequate remedy at law. *E. g., Township of South Fayette v. Commonwealth,* 477 Pa. 574, 385 A.2d 344 (1978); *Safeguard Mutual Ins. Co. v. Williams,* 463 Pa. 567, 345 A.2d 664 (1975); *Roberts v. School Dist. of Scranton,* 462 Pa. 464, 341 A.2d 475 (1975); *Berman v. Philadelphia,* 425 Pa. 13, 228 A.2d 189 (1967); *Wolf v. Baltimore,* 250 Pa.Super. 230, 378 A.2d 911 (1977). This demonstration could have consisted of "the averments of the pleadings or petition . . . [,] affidavits . . . [,] or any other proof which the court may require." Pa.R.C.P. 1531(a). *See also Minit–Man C. W. Corp. v. B. & C. T. Council,* 411 Pa. 585, 192 A.2d 378 (1963).

■ In permitting a preliminary injunction to issue solely upon the averments in a complaint, the present rules of civil

6. The exhibits included a copy of the Indiana decree divorcing appellee from her ex–husband and giving her custody of the children; a copy of an article that appeared in an Indiana newspaper regarding appellee and her ex–husband's illegal detention of the children; a copy of a letter purportedly written by appellee's ex–husband with appellant's address printed at the top; copies of two letters written by appellant, which stated that he was acting on the instructions of appellee's ex–husband; copies of criminal indictments returned by an Indiana grand jury against appellee's ex–husband for child–stealing; and a copy of an Indiana court order holding the ex–husband in contempt and revoking his visitation rights.

procedure manifest a dramatic departure from the strict evidentiary requirements existing under prior practice:

> One of the major changes in practice effected by these Rules is the elimination of affidavits as a condition precedent to the issuance of a preliminary injunction. Subdivision (a) of Rule 1531 eliminates entirely any mandatory requirement that any affidavit need be filed as a condition precedent to the grant of any type of injunction. The plaintiff's initial pleading, or his petition for a preliminary injunction, will be verified in every case. This verification will give the sanction of an oath to the plaintiff's papers. Supporting affidavits furnish no more guarantee of the truth of the plaintiff's position than his sworn complaint or petition.

> Further, the real protection to the defendant is not the possible penalty for perjury in making a false affidavit; it is the bond which the plaintiff must file under subdivision (b) of Rule 1531. Accordingly, subdivision (a) of Rule 1531 permits the court to grant a preliminary or special injunction, whether with or without notice, on the basis of "the averments of the pleadings" or of "such proof" as the court may require. Under this flexible standard, affidavits of the parties or of third persons have been made optional. The plaintiff may file affidavits if he wishes and the court may demand further supporting proof if it wishes. But the obligatory affidavit requirements of former Equity Rule 38 have been removed entirely.

> Under former equity practice a preliminary injunction would not issue unless persons other than the plaintiff supported the averments in the bill with their own affidavits and these were filed with the court. The former Equity Rules did not indicate how many should be filed, but there were numerous instances in which the court refused to grant the preliminary injunction because only one affidavit had been filed. Two or more were usually required.

> In addition, a special affidavit was required if an ex parte injunction was to be entered prior to any preliminary

hearing. This affidavit, which could be executed by the plaintiff, was for the purpose of certifying that irreparable loss or damage would result to plaintiff unless the injunction was issued immediately.

5 Goodrich–Amram 2d § 1531(a):3 at 269–70 (footnotes omitted).

*See also* 8 Stand.Pa.Prac.–Ch. 36 §§ 93–99 (1961).[7]

As this statement makes clear, the premise upon which the evidentiary requirements for the issuance of a preliminary injunction have been liberalized is that an injunction still may not issue without some sworn evidence justifying the issuance. It is easy to understand this insistence on sworn evidence; it represents a necessary precaution to ensure that the extraordinary powers of a court of equity

7. It should be recalled that in the present case, no bond was filed when the lower court granted appellee's petition *ex parte* on September 25; the lower court did not order the filing of bond until September 28. Because of the conclusion reached *infra*, we need not reach appellant's argument that without a bond, the preliminary injunction was a nullity, which could not have life breathed into it by a tardy bond. *But see* 5 Goodrich–Amram 2d § 1531(b):6 at 284–85; *see also Grosso v. Englert*, 381 Pa. 351, 113 A.2d 250 (1955); *Bowman v. Gum, Inc.*, 327 Pa. 403, 193 A. 271 (1937).

It is to be noted, however, that the court's order requiring appellee "to post bond in the amount of one hundred dollars ($100.00)" was deficient in that the order did not condition the continued effect of the preliminary injunction that had already issued upon the posting of the bond. *Rose Uniforms, Inc. v. Lobel*, 408 Pa. 421, 422, 184 A.2d 261 (1962). Also, at the hearing on October 6, the lower court, recognizing the possibility that its earlier orders were invalid, stated:

I am going to take this rule to show cause and request for temporary restraining order and the petition for temporary restraining order and special injunction as being filed now, and I am going to continue in full force and effect the bond that is already entered in this case.

R. at 58a.

However, in its order dated October 11, the court did not dissolve its orders of September 25 and 28 and then enter a new order granting a preliminary injunction upon plaintiff's prior posting of bond. Rather, the lower court's order states:

AND NOW, to wit, this 11 day of October, 1978, by agreement of the parties and their counsel, this matter is continued to Oct. 31, 1978, at 9:30 A.M. in Room 517 City Hall, Phila., and the Special Injunction issued on September 25, 1978 and reissued on October 6, 1978, will remain in full force and effect until hearing.

will not be misused by a party to the detriment of an innocent person. Thus the Supreme Court has often emphasized that because it is so drastic a remedy, a preliminary injunction should be issued only when all essential prerequisites to issuance have been met. *Credit Alliance Corp. v. Philadelphia Minit–Man Car Wash Corp.*, 450 Pa. 367, 301 A.2d 816 (1973). *See also Rick v. Cramp*, 357 Pa. 83, 53 A.2d 84 (1947); *Cardamone v. Univ. of Pittsburgh*, 253 Pa.Super. 65, 384 A.2d 1228 (1978); *Rush v. Airport Commercial Properties, Inc.*, 28 Pa.Cmwlth. 51, 367 A.2d 370 (1976).

■■■ Here, it cannot be maintained that all essential prerequisites to the issuance of a preliminary injunction were met. As already mentioned, the lower court received no testimony at all–although no reason appears why appellee could not have appeared before the court. The only sworn statements by appellee presented to the court were that her two children had been taken from Indiana by her ex–husband and secreted from her, and that appellant has information concerning the whereabouts of the ex–husband and the children. There were no averments that in removing the children her ex–husband had committed an unlawful act, or that her custody rights in the children had been violated, or that she otherwise had a right to have the children. The complaint, of course, purported to establish these matters, but the complaint was not sworn to by appellee but was improperly verified by appellee's attorney, and none of the exhibits attached to the complaint, except perhaps one,[8] was certified or otherwise authenticated.

This insistence upon *at least* a properly verified complaint may seem "technical," but no apology need be made for that. The rules are clear, and their requirements easily satisfied. Appellee's violation of the rules–more accurately, her coun-

---

8. Along with the copy of the purported criminal indictment against appellee's ex–husband, the complaint contains a copy of what appears to be a certification of the indictment by the clerk of an Indiana Circuit Court ("appears" since the certification, though containing the same caption and number as the caption and number on the indictment, does not specifically certify the indictment, but rather "an order of said Court, in the above titled cause").

sel's violation—is equally clear. Given that appellee sought the most extraordinary relief that a court can grant, no reason appears why she should not be required to abide by the rules. Furthermore, we are an appellate court. To sanction appellee's and the lower court's ignoring of the rules could only represent a most troublesome precedent. One may concede the likelihood that appellee *could have* produced sworn evidence as required by the rules before a preliminary injunction may issue; the point is that she did not. To hold that her unexplained and unexcused noncompliance is unimportant could only encourage noncompliance by others, and laxity on the part of the lower courts.

The order of the lower court is reversed, the preliminary injunction dissolved, and the case remanded for further proceedings.[9]

CAVANAUGH, J., concurs in the result.

HESTER, J., files a dissenting opinion.

HESTER, Judge, dissenting:

This bizarre case is presently before the court on appeal by Ronald Bluestein, attorney, from the issuance of a temporary restraining order and special injunction dated September 25, 1978 and continued in full force and effect by order dated September 28, 1978, subsequently reissued on October 6, 1978 and again continued in full force and effect by agreement of the parties and their counsel by order dated October 11, 1978.

The grant of appellee's request for injunctive relief which is the subject matter of the instant appeal accompanied the filing of a complaint in equity wherein the appellee has sought primarily:

**9.** Because of the conclusion that the lower court abused its discretion in granting appellee's petition for a preliminary injunction, we do not reach appellant's argument that the attorney—client privilege bars the relief sought in appellee's complaint and that therefore the issuance of the preliminary injunction lacked an equitable basis. We have, however, considered appellant's argument that the preliminary injunction violated due process because appellee's ex—husband had not been joined as a party to this action, and have found it without merit.

(a) to enjoin appellant–attorney, his agents, servants or employees, in any manner whatsoever whether directly or indirectly; the fact that the instant proceeding has been brought or that the instant proceedings are pending; and

(b) to order appellant–attorney to reveal to appellee any and all information which he may have concerning the present whereabouts of Alper and/or the children and the whereabouts of Alper and/or the children for the past year.

Obviously the theory underpinning the instant action is that upon learning of the bringing of this action, Alper would likely again flee with the children and attempt to further conceal their whereabouts.

The factual posture of this case was capsulized by the lower court in its opinion and must be restated here:

The facts set forth in the complaint depict a harrowing and tragic tale of a broken marriage terminated by a decree of dissolution on December 30, 1976 in Tippecanoe County, Indiana. Custody of the two children born of the marriage, ages 11 and 9, was given to mother–appellee with visitation rights to the father, Anatole Alper. On July 15, 1977, the father secured possession of the children for visitation of six weeks. During the early part of that period, he moved leaving no forwarding address. Since that time, the appellee has been unable to learn the whereabouts of the father or children and she has thus been deprived of any contact of any kind whatsoever with her children since July, 1977.

In August, 1977, appellee became aware that appellant–attorney here represented her former husband by means of a letter sent to a banker, bearing on the imprinted letterhead her husband's name and the appellant's office address and telephone number. Numerous other letters bearing the same imprint were sent to other persons in the community. Appellant–attorney, himself, sent support payments to appellee's former counsel.

The complaint further alleged that appellant has represented that he is a repository for mail for Anatole Alper and that he, appellant, talked to Alper on a monthly basis.

On August 26, 1977, appellee's former husband was indicted by the Grand Jury of Tippecanoe County, Indiana, upon two counts of child stealing and on November 28, 1977, the Superior Court of Tippecanoe County issued certain findings and orders in which the court found, inter alia, that Anatole Alper had concealed his whereabouts since August 12, 1977; that he had violated the custody and visitation orders of the court; that he was in contempt of court and that he had fled the jurisdiction to prevent enforcement of the custody–visitation orders.

The court ordered a fine and punitive damages of $100 per day and imprisonment, until Alper purges himself of contempt by returning the children to appellee. A warrant for Alper's arrest was issued.

The complaint further alleges that appellant has knowledge of the present whereabouts of Alper and accuses appellant of knowingly counseling Alper in the commission of a felony, to–wit, child stealing, and that he continues to aid and abet Alper in the commission of a crime and in violation of the court orders of Indiana.

Appellant raises four issues on appeal, to–wit: (1) the lower court's jurisdiction to hear this matter; (2) that the injunction was improperly issued without bond; (3) the applicability of the attorney–client privilege; and (4) a defect in the affidavit accompanying the Complaint in Equity.

Our learned colleagues in their majority opinion appear to conclude that the lower court has jurisdiction to entertain the instant action pursuant to the Uniform Child Custody Jurisdiction Act (supra), as well as pursuant to its general equity powers. However, the majority opinion reversing the Order of the lower court and dissolving said Preliminary Injunction concluded that a Preliminary Injunction should not have issued because of a purportedly improperly verified Complaint.

I disagree and therefore respectfully dissent.

I am convinced that the lower court properly exercised its equitable powers in issuing said Order and Preliminary Objection notwithstanding the absence of testimony and/or supportive evidence. The majority opinion accurately demonstrates that a Preliminary Injunction may issue solely upon the averments contained in a complaint. I believe that the operative facts in the instant case which caused–no, compelled–the lower court to issue its Order and Preliminary Injunction, were of such significance that it was convinced beyond doubt that its actions were absolutely essential if Appellee was to be afforded even the remotest of possibilities of locating her children. I believe the Complaint in Equity verified by Appellee's attorney in accordance with Appellee's personal affidavit of authorization dated July 28, 1978, satisfies the requirements of Pa.R.C.P. 1024(c). I feel that if scrutinized closely the affidavit of authorization certainly satisfies the verification requirements of Pa.R.C.P. 1024(c).

I find that Appellant's third issue on appeal that the September 25, 1978 injunction was improperly issued, since no bond was filed, is without merit. Three days later, the lower court continued said injunction with bond. Whatever defect therefore existed in the first instance was cured on September 28 when bond was posted. I am not convinced by Appellant's argument that without a bond, the Preliminary Injunction issued September 25, 1978 was a nullity which could not have life breathed into it by the posting of a bond three days later.

Finally, appellant also contends that the attorney–client privilege is applicable. (The majority did not address itself to this issue). The Act of 1887, P.L. 158 § 5(d), 28 P.S. § 321. We conclude that it is not. The privilege does not apply to representations or communications secured in furtherance of intended, present, or continuing illegality, even if the attorney is completely unaware that his advice is being sought towards that end. *In re Westinghouse Electric Corp. Uranium Contracts Litigation*, 76 F.R.D. 47 (USDC W.D.Pa. 1977).

Although our research reveals no Pennsylvania case which is factually similar to this case wherein the attorney–client privilege was raised, a New York court in, *In Re Jacqueline F.*, 94 Misc.2d 96, 404 N.Y.S.2d 790, noted the general rule as follows:

"As a general rule, an attorney may be compelled to disclose the name and address of his client on the theory that his knowledge as to these matters did not flow from a confidential communication." 404 N.Y.S.2d at 794.

As to the applicability of the privilege, the court went on to state:

"An attorney may validly assert the privilege as to his client's name or address in the limited instance where the client intended such information to be confidential and *further provided that protecting this cloak of secrecy will not aid in carrying out an unlawful purpose.*" 404 N.Y. S.2d at 795 (Emphasis added).

However, the court noted strong disapproval of a disappointed custody litigant's placing his desire to obtain custody above the law and held:

"However, an attorney's duty to his client is limited to rendering such legal assistance and advice as is the bounds of the law. *It cannot extend to aiding and abetting the client to evade the impact of the court either by acts of commission or omission.*" 404 N.Y.S.2d at 795. (Emphasis added).

In the instant case, we conclude appellant's failure to disclose Alper's whereabouts is not within the ambit of his lawful representation of Alper and therefore same is not protected by the attorney–client privilege.

As the lower court opined:

We ... believe it is now time, and that this is the proper case, in which all of the well prepared and capably argued objections interposed by (appellant) should be swept aside so that this court can address itself to the overriding human question of the best interests of the children, and in doing so make clear to all who will listen that the courts of this Commonwealth will not assist those who take the

law into their own hands in matters of child custody and that we will do all that is possible to bring matters such as these back into the proper court where the personal interest of the absconding parent will rightfully be relegated to a lesser position than that accorded the welfare and best interests of the children.

We believe that it is in keeping with the modern trend of law as evidenced by broad acceptance of the Uniform Child Custody Jurisdiction Act aimed directly at this kind of heinous behavior on the part of parents dissatisfied with the decisions reached by the courts of our land. (P. 33).

I agree.

I therefore respectfully dissent and would affirm the issuance of the Preliminary Injunction and remand to the lower court with instructions that it proceed forthwith with a trial on its merits.